## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DOE,

|

                         Plaintiff,

v.

MICHIGAN STATE UNIVERSITY,
MICHIGAN STATE UNIVERSITY BOARD
OF TRUSTEES; LOU ANNA SIMON, individually and
as agent for Michigan State University, JOHN ENGLER,
individually and as agent for Michigan State University,
and ANDE DUROJAIYE, individually and
as agent for Michigan State University, RICK SHAFER,
individually and as agent for Michigan State University,
ELIZABETH ABDNOUR, individually and as agent
for Michigan State University, DENISE MAYBANK,
individually and as agent for Michigan State University,

                         Defendants.

Hon. _____

Case No. 1:18-cv-1430

---

Nesenoff & Miltenberg LLP
Andrew T. Miltenberg
Stuart Bernstein
Tara J. Davis
Attorneys for Plaintiff
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com

Springstead Bartish Borgula &
Lynch, PLLC
Matthew G. Borgula (P57330)
Donald A. Davis (P24049)
15 Ionia Ave SW #520
Grand Rapids, MI 49503
616.458.5500 (telephone)
matt@sbbllaw.com
dondavis@sbbllaw.com

1

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, John Doe[1], by and through his attorneys NESENOFF &
MILTENBERG, LLP and SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC hereby
files the following complaint against the Defendants as captioned above.

## THE NATURE OF THIS ACTION

1.      Denied equal protection under the law as well as the most fundamental guarantees
of due process—without a hearing, without any opportunity to cross-examine his accuser or
adverse witnesses—Plaintiff John Doe ("Plaintiff," "Doe," or "John Doe") was falsely declared
guilty of sexual assault and dismissed from Michigan State University ("Michigan State" or
"University").

2.      As a result, Plaintiff, though innocent of any wrongdoing, has sustained
tremendous damages, including, without limitation, emotional distress, psychological damages,
loss of educational and career opportunities, reputational damages, economic injuries and other
direct and consequential damages.  To redress this gross injustice, Plaintiff hereby sues Michigan
State and the responsible University officials and agents of the University.

3.      The motivation behind Defendants' blind, unlawful rush to find Plaintiff guilty is
plain.  As will be detailed below, beginning in September 2015, Defendants came under
extraordinarily intense pressure to find in favor of female students who accuse male students of
sexual assault.   The sources of this intense pressure included:

> a.  a threat from the United States Department of Education, Office of Civil
> Rights ("OCR") to cut off federal funding to Michigan State due to claims
> that the University had failed to vigorously prosecute, make findings against,
> and punish alleged sexual assailants;

---

[1] Plaintiff has filed herewith a motion to proceed pseudonymously as "John Doe."

b.  a widely publicized report alleging extraordinarily high levels of unredressed sexual assaults against female undergraduates at Michigan State; and

c.  scandal, and potential liability, faced by Michigan State and its officials for sexual assaults committed by its former employee Dr. Larry Nassar.

4.   After September 2015, determined to placate OCR, to avoid the potential loss of millions of dollars in federal funding, restore its reputation, and protect itself from future liability, Defendants launched a campaign to—in its own words—go "above and beyond" even OCR's demands, prosecuting women's sexual assault claims aggressively, demonstrating its willingness to believe women who claimed sexual assault, to make findings against, and punish alleged assailants.  Plaintiff was unjustly a casualty of this campaign.

5.   Throughout the investigation and adjudication of Jane Roe's[2] complaint, Defendants engaged in substantial errors in violation of federal law, state law, and the University's own policies. A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants relied upon a gender biased investigative report produced by an investigator who acted as a prosecutor building a case for the complainant and disregarding inconsistencies in Jane Roe's story;  (ii) Defendants evidenced a gender bias against John Doe as the male accused of sexual misconduct throughout the investigative process; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; (v) Defendants deprived John Doe of a hearing where he could have the opportunity to confront and question his accuser; (vi) Defendants employed the "single-investigator" procedure, in which the

---

[2] The complainant in Michigan State's Title IX investigation is referred to pseudonymously as Jane Roe.

investigator served as prosecutor, investigator, judge and jury, adjudicating Doe's guilt without any checks and balances on sexual bias.

6. As a result of the University's erroneous and gender-biased decision in this matter, Plaintiff was dismissed from Michigan State.

7. Not only is Plaintiff's sanction based upon an erroneous outcome, it is unduly punitive. In issuing this sanction, the University failed to give independent consideration to the factors for determining appropriate sanctions as set forth in the University's Policies and Procedures. Rather, the University simply paid "lip-service" to those factors in issuing its sanction of dismissal.

8. Michigan State's imposed discipline has had, and will continue to have, long-term and severe consequences for Doe. Given the dismissal, Plaintiff, a member of the class of 2020, will not be able to complete his undergraduate degree at the University of his choice, Michigan State. It remains to be seen whether he can even complete his undergraduate degree by 2020. Given his dismissal from Michigan State for a conduct violation, Plaintiff's ability to gain admission to other undergraduate institutions has been demonstrably harmed. The conduct dismissal from Michigan State likewise severely damages Plaintiff's chances of admission to law school and a career in the government in national security thereafter. Finally, Michigan State's erroneous and gender-biased finding has caused Plaintiff severe reputational harm, emotional harm and psychological harm.

9. Plaintiff has filed a Notice of Intent to File Claim with the Michigan Court of Claims pursuant to MCL 600.6431. The Notice of Intent to File Claim was received by the Clerk's Office on December 21, 2018 at 11:22 a.m.

## THE PARTIES

10.     Plaintiff is a natural person domiciled in the State of Michigan.  During the events described herein, Plaintiff was a sophomore undergraduate student at Michigan State, class of 2020.  At all times relevant herein, Plaintiff resided in a dormitory on the Michigan State campus.

11.     Defendant Michigan State is a land grant University established by the State of Michigan, and its main campus is located in East Lansing, Michigan.  Michigan State is the beneficiary of state appropriations and is the recipient of state and federal grants.

12.     Defendant Michigan State University Board of Trustees ("Michigan State Board of Trustees") is an eight-member board responsible for making rules and regulations to govern Michigan State.  The election of these Trustees is prescribed by Article XIII, Section 5 of the Michigan State Constitution and Michigan Election Law section 168.286.

13.      Defendant Lou Anna Simon was the President of Michigan State during the investigation and sanctioning phase of Plaintiff's conduct process. Ms. Simon is sued in her individual capacity and as an agent for Michigan State.  Upon information and belief, Ms. Simon is a resident of the State of Michigan.

14.     Defendant John Engler was the Interim President of Michigan State during the appeals phase of Plaintiff's conduct process.  Mr. Engler is sued in his individual capacity and as an agent for Michigan State.  Upon information and belief, Mr. Engler is a resident of the State of Michigan.

15.     The Board of Trustees, as well as Ms. Simon and Mr. Engler as the Board's administrative hands during the period in question, are responsible for ensuring that all Michigan State employees are properly trained and supervised to perform their jobs.

16.     Defendant Ande Durojaiye was the Director of the Office of Institutional Equity ("OIE") and Michigan State's Deputy Title IX Coordinator at all times relevant to this complaint.  Dr. Durojaiye was responsible for ensuring that the University complied with all applicable antidiscrimination laws, including Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and is sued individually and in his capacity as an agent of Michigan State University. Upon information and belief, Dr. Durojaiye is a resident of the Commonwealth of Kentucky.

17.     Defendant Rick Shafer is Michigan State's Associate Director of Student Conduct and Conflict Resolution and is named herein individually and in his capacity as agent of Michigan State.  Upon information and belief, Mr. Shafer is a resident of the State of Michigan.

18.     Defendant Denise Maybank, is the Vice President of Student Affairs and Services and is named herein individually and in her capacity as agent of Michigan State. Upon information and belief, Ms. Maybank is a resident of the State of Michigan. Defendant Maybank erroneously, and operating with gender-bias against Plaintiff, denied Plaintiff's appeal.

19.     Defendant Elizabeth "Liz" Abdnour, J.D. is a Senior Institutional Equity Investigator at Michigan State's OIE.  Upon information and belief, Ms. Abdnour is a resident of the State of Michigan.   She conducted a gender-biased investigation into Roe's sexual misconduct allegations against Plaintiff.

## JURISDICTION AND VENUE

20.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims

are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.  Additionally, this court has diversity jurisdiction because: (i) Plaintiff is citizen of the state of Michigan; ii) while the remaining Defendants are citizens of the state of Michigan, on information and belief, Defendant Durojaiye is a citizen of the commonwealth of Kentucky; and (iii) the amount in controversy is over $75,000.

21.     This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Michigan State within the State of Michigan.

22.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district and because virtually all of the Defendants are located in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### BACKGROUND: THE "APRIL 2011 DEAR COLLEAGUE LETTER" OF THE DEPARTMENT OF EDUCATION'S OFFICE FOR CIVIL RIGHTS

23.     On April 4, 2011, the OCR of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "Dear Colleague Letter").  The Dear Colleague Letter provides a necessary set of background facts to this action.

24.     The Dear Colleague Letter advised that, to comply with Title IX, colleges and universities must have procedures to promptly investigate and resolve complaints of sexual misconduct.

25.     Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof – "more likely than not" – in cases involving sexual misconduct, including

assault.   Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

26.     The Dear Colleague Letter stated that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

27.     The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

28.     The Dear Colleague Letter stated that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

29.     After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

30.     The Obama Administration, through the DOE and OCR, treated the Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

31.     In February 2014, Former DOE Assistant Secretary for Civil Rights, Catherine J. Lhamon ("Lhamon"), told college officials attending a conference at the University of Virginia that schools needed to make "radical" change.

32.     According to the *Chronicle of Higher Education*, college presidents said afterward that there were "crisp marching orders from Washington."   *See* "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," *Chronicle of Higher Education*, February 11, 2014 (available at:   https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703).

8

33.     In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus.  For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the Dear Colleague Letter.  She told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school."

34.     In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat," Lhamon warned.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding that "[i]f a school refuses to comply with Title IX in any respect, I will enforce."  Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step… It means that so far the process has been working."  Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," msnbc.com, July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

35.     Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

9

36.     To support making the Dear Colleague Letter binding, the OCR hired hundreds of investigators for Title IX enforcement.  The Federal Government is investigating approximately 250 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago as well as many top state universities including Michigan State.

37.     The Department of Education negotiated settlements with many schools, including Michigan State, which resolved two Title IX investigations on September 1, 2015.

38.     The investigations resolved in 2015 stemmed from Michigan State's failure to promptly act on two reports of sexual assault as well as Michigan State's failure to have proper procedures and policies in place to handle sexual assault reports.

39.     There are currently two pending OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018.

https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).  The first OCR investigation was pending during all periods relevant to this complaint. The second OCR investigation was commenced just days before Michigan State's February 26, 2018 unjustified denial of Plaintiff's appeal.

40.     Colleges and universities, including Michigan State, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The Obama Administration issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds."  It further advised that the DOJ shares authority with OCR

for enforcing Title IX, and may initiate an investigation or compliance review of schools.  If a voluntary resolution cannot be reached, the DOJ may initiate litigation against the institution.  In July 2016, Vice President Joseph Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding.  "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

41.     To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government.  Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

42.     The DOJ and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.  The *Chronicle of Higher Education* noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  Robin Wilson, "*Presumed Guilty: College men accused of rape say the scales are tipped against them,*" *Chronicle of Higher Education,* September 1, 2014,  https://www.chronicle.com/article/Presumed-Guilty/148529.  In the same article, the *Chronicle* noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases,

colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id*. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

43.     On September 22, 2017, OCR rescinded the Dear Colleague Letter and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See*, *e.g.*, https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

44.     The interim OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. The interim guidance also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

45.     The interim OCR guidance, as well as the accompanying review of OCR's prior guidance documents, suggest that the policies and procedures in place at all times relevant to this lawsuit – which were tailored in such a way as to comply with the Dear Colleague Letter under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender

equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

## THE CONTRACT BETWEEN PLAINTIFF AND MICHIGAN STATE

46.     Plaintiff, like all other students attending Michigan State, agreed to be bound by Michigan State's policies and procedures including its Relationship Violence and Sexual Misconduct policy (the "RVSM Policy").

47.     The RVSM Policy is intended to define relationship violence, stalking, sexual misconduct, and describe the process for reporting violations of the policy, outline the process used to investigate and adjudicate alleged violations of the policy, and identify resources available to members of the Michigan State community who are involved in an incident of relationship violence, stalking, or sexual misconduct.  *See* RVSM Policy I.

48.     The RVSM Policy states that it applies to all members of the Michigan State community, including faculty, staff, and students regardless of gender, sexual orientation, or gender orientation and prohibits relationship violence, stalking, or sexual misconduct against employees, students, or third parties.  *See* RVSM Policy II.

49.     Michigan State employs a Title IX Coordinator to oversee its gender equity work to ensure compliance with Title IX, including its grievance procedures, education/prevention efforts, and training.  The Title IX Coordinator is charged with reviewing information about relationship violence, stalking, and sexual misconduct complaints to identify and address any patterns or systematic problems that arise during the review of such complaints.  *See* RVSM Policy IV.

50.     Pursuant to the RVSM Policy, Michigan State has established the OIE to ensure Michigan State's compliance with federal and state laws and Michigan State policies and

procedures regarding discrimination, harassment, relationship violence, stalking, and sexual misconduct.  *See* RVSM Policy V.

51.    The Director of OIE is designated as the Deputy Title IX Coordinator for Investigations.  *See* RVSM Policy V. At all relevant times described herein, Dr. Durojaiye served as Director of OIE and Deputy Title IX Coordinator.

52.    The RVSM Policy defines a "Claimant" as a person who may have been subjected to prohibited conduct regardless of whether that person makes a report or seeks action under the Policy.  Claimants have the opportunity to review the preliminary investigative report and provide feedback and appeal the outcome of the OIE decision and appeal or grieve the sanction.  *See* RVSM Policy VI.

53.    The RVSM Policy defines a "Respondent" as a person, registered student organization, or entity that has been accused of committing prohibited conduct.  Respondents have the opportunity to review the preliminary investigative report and provide feedback and appeal the outcome of the OIE decision and appeal or grieve the sanction.  *See* RVSM Policy VI.

54.    The RVSM Policy defines an "Investigator" as a professionally trained staff member of the OIE or a professionally trained outside expert who conducts the investigation under the supervision of the Title IX Coordinator and/or Director of OIE.  *See* RVSM Policy VI. Under the RVSM Policy, an investigator "conducts an impartial, fair and unbiased investigation" into allegations.  *Id.*  The Investigator "review[s] all of the information and applies the preponderance of the evidence standard to determine whether the conduct at issue occurred, and, if so, whether the conduct constitutes a violation of the RVSM Policy." *Id.*

55.    The RVSM Policy defines "Sexual Violence" as including rape, sexual assault, and sexual contact.  *See* RVSM Policy X.C.

14

56.     The RVSM Policy defines "Sexual Assault" as a subset of Sexual Violence and includes "sexually penetrating, attempting to sexually penetrate, or having sexual contact with another individual by force or threat of force; without consent; or where the victim is incapacitated." *See* RVSM Policy X.C.

57.     The RVSM Policy defines "Incapacitation" as a state where an individual cannot make an informed and rational decision to consent to engage in sexual activity because the individual lacks conscious knowledge of the nature of the act. *See* RVSM Policy X.(F). Under the RVSM Policy, incapacitation can only be found when the respondent "knew or should have known that the claimant was incapacitated when viewed from the position of a sober, reasonable person." RVSM Policy X.(F). The RVSM also makes clear that black out intoxication is not incapacitation. RVSM Policy X.(F).

58.     The RVSM Policy calls for the OIE to investigate claims of sexual assault using trained professionals to conduct an investigation under the oversight of the Deputy Title IX Coordinator for Investigations. *See* RVSM Policy XIII.M.

59.     The RVSM Policy states that "[t]he University has an obligation to conduct a prompt, adequate, reliable, and impartial investigation to determine what occurred and then to take appropriate steps to resolve the situation when it learns of an incident of sexual misconduct, stalking or relationship violence regardless of whether the alleged victim is the individual who reports the relationship violence, stalking, or sexual misconduct." *See* RVSM Policy XIII.M.1.

60.     Investigations begin with a determination of whether Michigan State has jurisdiction over the matter. If jurisdiction is established, the claimant and respondent are notified of the initiation of the investigation, the potential policy violations at issue, the right to

participate in the investigation, the timeframe for responding, and that the investigation may proceed without the participation of either party.  *See* RVSM Policy XIII.M.1.a

61.     Investigations include interviews with the claimant, respondent, and relevant witnesses.  The claimant and the respondent may have an advisor of their choice present at any meeting during the investigation process and the claimant and the respondent both have the right to provide evidence, witnesses, and other relevant information during the investigation process. *See* RVSM Policy XIII.M.1.a

62.     OIE is charged with interviewing witnesses and reviewing electronic and written material if such documents exist.  In general, OIE will not consider statements of personal opinion, rather than direct observations or reasonable inferences from facts, or statements as to any party's general reputation for any character trait, including honesty or chastity.  *See* RVSM Policy XIII.M.1.b.

63.     The RVSM Policy also provides that the parties to the investigation are primarily responsible for providing information and evidence, but the OIE, to the extent possible will gather evidence relevant to the investigation that may be available within the University context or by contacting outside agencies, including medical treatment providers.  *See* RVSM Policy XIII.M.1.b.

64.     During the investigation process, both parties will be provided timely notice of any meeting at which their presence is requested or required.  *See* RVSM Policy XIII.M.1.c.

65.     Crucially, the RVSM Policy prohibits the parties from cross-examining each other during the investigation or adjudication process.  They are instead required to submit questions in writing to the OIE to be asked of the other party.  Questions can be submitted at any time during the investigation process up to the deadline for the review of the preliminary investigation

16

report.  *See* RVSM Policy XIII.M.1.c.  But the RVSM does not guarantee that any given questions submitted by the accused will in fact be asked.  *Id.*

66.     At the conclusion of the fact-finding portion of the investigation process, both parties are supposed to be provided with an opportunity to review the preliminary investigation report and provide feedback to the information gathered, as well as ask any questions, before a final report is issued.  Michigan State utilizes a preponderance of the evidence standard during the investigation process, as well as in all related proceedings, including disciplinary hearings.  A respondent is presumed not to have violated the RVSM Policy unless a preponderance of the evidence establishes a policy violation.  *See* RVSM Policy XII.M.1.d.

67.     These procedures, adopted by Michigan State under pressure from OCR and the "Dear Colleague Letter," contrast sharply with procedures employed by the University for other disciplinary violations such as academic integrity violations (e.g., cheating or plagiarism), which guarantee to accused students live hearings, cross-examination, adjudication by multi-member hearing panels, and in some contexts a clear-and-convincing standard of proof.

68.     Both the claimant and the respondent will be notified concurrently, in writing of the final outcome of the investigation, the rationale for the outcome, and the process to challenge the investigation findings.  *See* RVSM Policy XIII.1.M.d.

69.     Pursuant to the RVSM Policy, if the investigation results in a determination that relationship violence, stalking, or sexual misconduct occurred, the matter is referred to the Student Conduct and Conflict Resolution Office ("SCCR") so that the Sanction Panel can determine the appropriate sanction.  *See* RVSM Policy XIII.1.M.d. The Sanction Panel is comprised of one student, one faculty member, and one staff member.  *See* RVSM Policy VI.

70.     The RVSM Policy provides that where the OIE considers evidence of prior sexual history as part of the investigation, the evidence is included in the preliminary report, and the parties will have an opportunity to challenge its relevance and whether it should be considered in the investigator's analysis.  Relevant evidence of prior sexual history must be based on direct information; not rumor, hearsay, speculation, or conjecture.  *See* RVSM Policy XIII.M.d.2.

71.     The RVSM Policy contemplates that Michigan State will complete its investigation within sixty calendar days, although the time frame can be extended for good cause.  To that end, the OIE Investigator is supposed to contact the claimant within five calendar days of receiving the report/complaint and contact the respondent within five calendar days of meeting with the claimant.  The OIE's preliminary report is supposed to be provided to the parties within 25 calendar days of completing all relevant interviews and gathering relevant evidence.  The final Report is supposed to be issued within 25 calendar days after receiving feedback from the parties or completing any additional investigation.  *See* RVSM Policy XIII.M.d.5.

72.     The RVSM Policy provides that in instances where no violation is found, the parties shall have ten calendar days from the date of the OIE decision to file an appeal.  In the event a violation is found, the Sanction Panel is supposed to issue a written decision regarding an appropriate sanction within seven calendar days after the panel meets.  The claimant and respondent have ten calendar days from the date of the sanction decision to appeal either the OIE decision or the sanction imposed.  *See* RVSM Policy XIII.M.d.6.

73.     In cases where the OIE investigation finds that sexual misconduct, stalking, or relationship violence occurred, Michigan State will determine the appropriate, enforceable

sanction. The sanction will be reasonably calculated to stop the harassment and prevent its recurrence. *See* RVSM Policy XIII.M.d.10.

74.     The disciplinary sanctions should be based on a consideration of all circumstances in a particular case. The Sanction Panel will consider a range of factors including but not limited to: (i) the nature and severity of the misconduct; (ii) the need to stop the misconduct and prevent its recurrence; (iii) the need to remedy and address the impact or effects of the conduct on the claimant and other members of the campus community; (iv) the respondent's prior record of misconduct; (v) the level of ongoing threat to the safety and security of the claimant and campus community; (vi) aggravating or mitigating factors; and (vii) when applicable, the impact of the separation on both parties. *See* RVSM Policy, Appendix K.

75.     An appeal must be based on one or more of the following grounds: (i) "The OIE finding was arbitrary and capricious. A finding is arbitrary and capricious when the application of the [RVSM] policy has no reasonable basis in fact;" (ii) "The OIE findings resulted from procedural error (including bias or impartiality) materially affected the outcome;" and (iii) "The sanction is clearly inappropriate or is not commensurate with the seriousness of the offense." RVSM Policy Appendix I.

76.     Appeals involving dismissal of a student will be determined by the Vice President for Student Affairs and Services. RVSM Policy Appendix I.

**PLAINTIFF IS WRONGLY ACCUSED AND ULTIMATELY FOUND
RESPONSIBLE FOR A SEXUAL ASSAULT THAT HE DID NOT COMMIT**

**A.  Background**

77.     In high school, Plaintiff was in all respects an exemplary student with a 4.2 grade point average.

78.     Plaintiff matriculated at Michigan State in the fall of 2016 and was beginning his sophomore year at the time of the alleged sexual assault. He was an International Relations Major with a Minor in Muslim Studies. Prior to the alleged assault, Plaintiff had been accepted to attend the MSU's John Madison College 2018 Brussels Study Abroad Program.

79.     Doe was an exceptionally dedicated student who made the Dean's List all semesters at Michigan State. Through enormous dedication, Doe was even able to make the Dean's List during the pendency of Michigan State's disciplinary proceedings against him. As delineated below, Doe did so, notwithstanding the social isolation, stigma of the investigation, retaliation by Roe's friends, and the pressure of a gender-biased investigation stemming from false accusations.

80.     Plaintiff's life aspiration was to attend law school immediately upon graduation from Michigan State. Thereafter, his goal was to follow in his father's footsteps, protecting and serving our country in a government national security position.

81.     Prior to the alleged assault on August 31-September 1, 2017, Plaintiff had never been involved in any disciplinary proceeding at Michigan State or elsewhere. Indeed, given his career aspirations, Plaintiff held his disciplinary standing in high regard.

82.     In high school, Plaintiff likewise distinguished himself academically as a member of the National Honor Society. He was devoted to community service, co-organizing a program for special needs children and volunteering monthly at an animal shelter.

83.     At the time of the alleged incident, Jane Roe was a freshman at Michigan State. Jane Roe and John Doe both lived on the same floor of the South Case Hall dormitory.

84.     Doe and Roe met during "Move-In" on or about the weekend of August 25, 2017, when Roe and a friend came to Doe's room to introduce themselves.

85.     Before the night in question, they had only known each other for a few weeks and were, at best, casual acquaintances.

**B.  The Night of August 31-September 1, 2017**

      **a.  Doe and Roe Meet in G.K and K.W.'s Room**

86.     On August 31, 2017, starting at approximately 9:00 p.m., Doe was in his suitemate, C.A.'s room.  There, Doe, C.A. and their roommate, J.W. were mixing a number of shots of vodka with flavored Sparkling Ice and drinking some Bud Light beers.  Doe was unsure of the brand of vodka, but he believed it was somewhere around a ninety proof.

87.     Doe and J.W. had no intention of going out as they were highly intoxicated.

88.     At approximately 9:30 p.m. on August 31, 2017, Roe was socializing in the dorm room of her friends, G.K and K.W., who also live on the same floor as Roe and Doe.  Roe was a part of a group of approximately 6 individuals in G.K and K.W.'s room.  The group, including Roe, was planning to go to a "paint party" at the Delta Sigma Phi Fraternity house.

89.     Roe and the group in G.K. and K.W.'s room began drinking at approximately 9:30 p.m.

90.     At some point between 9:00 p.m. and 10:30 p.m., J.W. walked down the hallway, where he encountered the group, which included Roe.  The group asked J.W. to take a picture of them, and then invited J.W. to come to the "paint party."

91.     J.W. then returned to his room and asked Doe if he would like to go to the "paint party." Doe responded affirmatively.

92.     Shortly before 10:30 p.m., J.W. and Doe then made their way to G.K and K.W.'s room.  Doe did not consume any alcohol in G.K and K.W.'s room.

93.     At approximately 10:30 p.m., someone from the group in G.K and K.W.'s room called an Uber, and everyone, including Doe and Roe, got into the vehicle.

94.     By 10:30 p.m., Doe believed that he had ten or eleven shots of vodka, in addition to some beers.

95.     In her investigative interview, Roe twice indicated that she did not have that much to drink.  She first stated, "I did not think I drank that much."  She next stated that she was not sure how many drinks she had but "'probably'" had three drinks.  She indicated that she was drinking strawberry lemonade flavored vodka mixed with lemonade.  She indicated that she usually puts two shots per drink but did not specifically indicate whether she did so on the night in question.  Later in the investigative interview, Roe contradicted her earlier statements, stating that "it was possible she had consumed more alcohol prior to leaving Case Hall [the dormitory]."

### b.  The Fraternity Party

96.     The group, including Doe and Roe, reached the Delta Sigma Phi house at around 10:45 p.m.  Before leaving the Uber, Doe gave his phone to J.W. because Doe's shorts did not have pockets.  Doe's phone also contained his identification card which provides security access to the Case Hall elevator.

97.     The "paint party" was in a large backyard with an outdoor dancefloor and a large crowd already gathered.  The group stood on the dancefloor and waited for the individuals on stage to shoot paint over the crowd.

98.     Roe "grabbed" Doe and began dancing with him provocatively for about five minutes.

99.     Roe then grabbed Doe's hand and asked him to find her a bathroom.  From this point on, Doe and Roe lost contact with the group that they came with.

100.     Doe told Roe that he would try to find her a bathroom.  Roe followed Doe, as he approached a member of the fraternity and asked if Roe could use the bathroom in the fraternity house.  The fraternity member said no one was allowed in the house.

101.     Doe relayed this information to Roe. In response, Roe told Doe that she would "go" in the trees off to the side of the dancefloor.  Roe asked Doe if he would "watch out" for her so no one would see.

102.     Doe agreed.  To give Roe privacy, he turned his back and kept a "watch out." When Roe was done going to the bathroom, Doe and Roe stood on the edge of the dancefloor.

103.     Doe and Roe tried to look for the group on the dancefloor but were unsuccessful. They spoke about ways that they might try to find their group.

104.     A few minutes later, Roe told Doe she needed to throw up and asked if he would "watch out" for her again as she vomited behind a car near to the trees.  Doe agreed and turned his back away from Roe to give her privacy.

105.     Once Roe finished, Doe and Roe again returned to the edge of the dancefloor and attempted to find the group with no success.

106.     Still not feeling well, Roe told Doe that she wanted to "gag" herself so she could throw up to help her feel better. Roe walked about 6 feet away from Doe, and Doe turned around to again give her privacy.

107.     As Doe turned around to check on Roe, someone bumped into Roe accidentally. Roe fell over and rolled down a slight hill and over some sticks.  Rolling over the sticks caused scratches to Roe's legs and thighs.

108. Doe went towards Roe to help her, but she was already standing when Doe reached her.

109. As Roe and Doe walked up the hill, they encountered L.M., one of Roe's friends from middle school. L.M. was not a part of Roe and Doe's original group.

110. Doe briefly left L.M. and Roe to try one more time to find the group that they had come to the party with. Doe was again unsuccessful, and he returned to L.M. and Roe.

111. Because he was unable to find the group, Doe suggested that they return to the dormitory. Roe agreed.

112. Roe and Doe went back towards the entrance of the dancefloor one last time. At this point, Doe felt very nauseous and told Roe. Doe and Roe once again agreed that since Doe was now not feeling well, and they could not find their group, that they would go back to their dormitory.

113. Roe pulled Doe into her and kissed him. Roe said Doe was "being nice" and she thanked him for staying with her.

### c. The Walk Back to the Dormitory

114. Roe and Doe then walked approximately 1.5 miles back to their dormitory, Case Hall.

115. Shortly after they began walking, Doe felt nauseous. Roe and Doe stopped walking, and Doe went behind a tree to vomit.

116. During the walk, Doe and Roe had a pleasant intellectual and personal conversation, in which Roe did most of the talking. A summary of the conversation follows:

    a. Roe asked Doe where he had gone to high school;

    b. Roe and Doe discussed the sports that Doe played, i.e. hockey and football.

    c.   Roe and Doe discussed their mutual love for the Red Wings hockey team;

    d.   Roe and Doe discussed the transition from high school to college. Specifically, Roe told Doe that she was glad to have graduated high school. Roe was politically conservative and did not fit into her high school's liberal atmosphere.

    e.   Doe and Roe then discussed their political views and discovered that they were both politically conservative.   They specifically talked about the political topics that they agreed upon in the wake of the 2016 election.

    f.   Doe asked Roe if she liked their shared College inside the Michigan State University.  Doe and Roe talked about the challenges of college.

    g.   Roe told Doe that her parents were no longer financially supporting her, and that she had a strained relationship with her parents.

    h.   Roe told Doe that she was embarrassed about throwing up.

117.    During the walk back, Roe periodically stopped to initiate kisses, which Doe returned.

118.    About midway through their walk back to Case Hall, Roe told Doe that she wanted him to come up to her room when they got back. Doe agreed.

119.    As they approached their dorm, however, Doe and Roe began to worry about how Doe was going to get into Case Hall.  Doe had given his phone and identification card to J.W. when the group arrived at the party.

120.    Before entering the dormitory, Roe told Doe to "act normal" so to avoid any suspicion as they entered. Luckily, the main door was open when they arrived at Case Hall at approximately 12:20 a.m.

121.    Doe and Roe then entered the floor where their rooms were located.

**d.  The Alleged Incident**

122.    Roe unlocked her dorm room, and the two went inside.

123.    Roe told Doe that she wanted to try to "gag" herself one last time. Roe went to the bathroom to try to induce vomiting, but only saliva came out.  Roe told Doe that she was glad because she was feeling better.

124.    Roe and Doe then sat on Roe's futon and began to kiss each other more passionately than before.  Roe paused and removed her tank top.  After it was off, she kissed Doe again, and Doe slowly began to take his shirt off.

125.    Notably, Doe's account is corroborated by E.M., Roe's suitemate and friend. E.M. noted during her interview with Defendant Abdnour that she opened the door between their shared bathroom to check on Jane Roe. Upon opening the door, she saw Jane Roe on her futon shirtless and no bra on with the John Doe facing her. E.M. believed Jane Roe had her pants on and that John Doe was fully clothed.

126.    In response to Defendant Abdnour's pointed question of how intoxicated Jane Roe appeared, E.M. stated that she looked tired.

127.    After continuing to kiss, Doe then began to feel nauseous again, and he ran into the bathroom to throw up.

128.    After Doe threw up, he tried to lay on the bathroom floor because he was tired, but Roe told him that he was "talking too loud," and she was concerned that he would wake her suitemates.

129.    Both Roe and Doe had their shirts off at this time. After Doe felt better, they moved back to the futon.

130.    Roe and Doe continued to kiss on the futon, and then Roe removed her shorts. Doe then asked Roe "can I take mine off too?"  Roe gave her consent through the following actions:  she rolled her eyes, smirked, and kept on kissing Doe.

131.    Roe then asked if Doe had a condom. Doe replied, "No, but my roommate probably does." Roe told Doe to go get a condom and remarked "Don't keep me waiting."

132.    Doe put his clothes back on and stumbled back to his room, zig zagging in the hall and using the walls to keep himself upright.

133.    The door to Doe's dorm room was unlocked. Doe's roommate, J.W., corroborated that Doe came into their dorm room "stumbling."

134.    Doe asked J.W. where J.W.'s condoms were. J.W. pointed to a drawer by his clothes. Doe got a few condoms and left the room."

135.    When Doe returned to Roe's room, she had independently climbed into her top bunk bed. Roe told Doe to lock the door. Doe climbed up to Roe.  As the two began kissing again, Doe placed the condoms on a dresser near Roe's bed.

136.    Roe asked if Doe had brought the condoms, and he said "yes."  Roe told Doe to "get one." Doe reached down and got one of the condoms off the dresser, as Roe independently took her underwear off.  Doe then took his underwear off.

137.    Before opening the condom package, Roe told Doe that she had never had sex before. Doe stated with astonishment, "Woah, really?"  Roe then responded, "Well, I kind of have, but I did not like it so I don't count it."

138.    Before progressing any farther in the sexual encounter, Doe verbally asked Roe several times if she was "ok" with the sexual encounter, and if she was positive she wanted to continue.

27

139.    Each time Doe asked, Roe verbally responded and gave her affirmative consent. Roe said she was "ok," and she wanted to continue.  Roe even grew impatient with Doe and stated: "just put it [the condom] on already."

140.    As a result of his excessive alcohol consumption, Doe struggled to get a full erection. Doe therefore struggled to get the condom on and put it on as best he could.

141.    As Doe struggled to advance the sexual encounter, Roe used her hand to guide Doe's penis into her vagina and to attempt penetration.

142.    However, due to Doe's inability to obtain a full erection, he could not penetrate Roe's vagina.

143.    Doe was embarrassed.  To save face, he told Roe that he was unable to insert his penis into her vagina because the condom had not gone on properly.

144.    Doe then took the condom off, and he put on a new one.  The same problem occurred.  Because he was unable to obtain a full erection, he could not enter Roe's vagina.

145.    In total, Doe and Roe attempted intercourse for approximately fifteen minutes before giving up and resorting to mutually kissing each other.

146.    Doe and Roe then chatted about how tired they both felt.

147.    Doe and Roe then decided to get down from the lofted bed, as the slightest movement caused the bed to shake. Doe and Roe independently climbed down from the bed.

148.    They returned to the futon and mutually began kissing again. Roe then moved over and laid on the ground next to the futon. Doe and Roe then attempted to engage in sexual intercourse a third time.

149.    Again, Doe was unable to maintain a full erection and Doe and Roe were unable to complete intercourse for a third time.

150.     At no point during the period in question was Doe able to obtain a full erection.

151.     At no point during the period in question did Doe ejaculate.

152.     During their third attempt at intercourse, Doe and Roe heard the main door to the room begin to unlock from the outside. Roe quickly jumped up to make sure no one came in. She cracked the door open so she could tell her roommate, M.M., to give the parties a moment to get dressed.

153.     At that point, Roe turned the light on.  Doe put his clothes back on, and Roe put on a t-shirt and gym shorts from her drawer.

154.     M.M. then entered and the three began to have a conversation.

155.     M.M. was returning to the dorm from work at a sports bar, and she told Roe and Doe about the work she was doing and how much it entailed.

156.     M.M. noticed the scratches on Roe's legs, and Roe told her that she would tell her parents she got the scratches from slide-tackling while playing soccer.

157.     M.M. noticed the condoms and jokingly asked: "[w]ell, what happened here?" Roe responded with a giggle.

158.     Roe also told M.M. and Doe that she was attending a concert during the upcoming weekend.

159.     M.M. also told Roe and Doe that someone who lived on their floor in Case Hall had been involved with the police that night.

160.     Upon hearing this, Roe wanted to go across the hall to check in on her friends K.W. and G.K.. Roe asked Doe to accompany her.

161.     Roe opened the door to the room shared by K.W. and G.K. G.K was in her bed, but Doe heard her say she had not seen K.W.

162.     Roe then closed the door.  Roe and Doe faced each other. Doe said, "Well okay. I think we both should get to bed now." Roe agreed; the two hugged as they said goodnight. Doe said he would see Roe tomorrow and she responded "Yeah, see you tomorrow."

163.     Doe then returned to his room, retrieved his phone from J.W., then went to sleep.

164.     When later interviewed by Defendant Abdnour and questioned about Roe's intoxication, M.M. told her, she "did not look drunk". She "did not look like a mess or anything" M.M. further told Defendant Abdnour that Roe's eyes were "not bloodshot" nor was she "unable to focus".

165.     Moreover, M.M. advised Defendant Abdnour that she would not have known Roe was "drunk" if Roe had not told her.

**e. The Days Following the Alleged Incident**

166.     The next day, September 1, 2017, Doe woke up with a hangover and went to breakfast.

167.     Around 11:00 a.m., he went to Roe's room to check in on her, but there was no response when he knocked on the door.  The light was off in Roe's room.

168.      Roe alleges to have filed a report with MSU Police on September 1, 2017. However, the only report made by the MSU Police to OIE was a full week later on September 8, 2017.

169.     Roe further alleges, that on September 1, 2017 to have gone to Sparrow Medical Center, to undergo a SAFE exam, but she was unable to complete it, given the wait time, and claiming that she had to go "up north with her family."

170.     Roe did not complete a SAFE exam until September 3, 2017 at HAVEN, in Pontiac, Michigan.

171.    Thereafter, Roe's friends engaged in a campaign against Doe.

172.    In the days following the alleged assault, Doe's dorm hall had an "open door night." The purpose of the event was for everyone on the floor to keep their doors open to meet each other and socialize.

173.    As Doe was working on his homework, he kept his door closed. Doe heard a "rumble" at his door, but when he looked to see who was there, he did not see anyone.

174.    Doe said, a few minutes later, he heard "another rumble," but again, there was no one there. About fifteen minutes later, when Doe was leaving the room to get something to eat, he saw that someone had written an obscenity on his name tag which was affixed his door.

175.    The following week, when Roe and her friends would walk by Doe's room, her friends would look in and smile curiously at him, while Roe avoided looking in.

176.    J.W., Doe's suitemate, reported to Defendant Abdnour at his interview that about a week after Doe and Roe's encounter, at around 3:00 a.m., E.M, and a group of friends, banged on the door of their room. According to J.W., the group said that Doe had disrespected Roe and been rude to her. J.W. described the group's conduct as "really aggressive."

177.    The day after E.M.'s encounter at Doe's room, E.M. posted a snapchat video of the group running down the hall. The video was captioned: "About to fight."

178.    On Sunday, September 17, 2017, as Doe was in the cafeteria eating lunch alone, Roe and her friend, G.K. came up to him.  G.K. confronted him and began speaking so loudly that others began to stare.

179.    G.K. asked if Doe and Roe had sex on the night in question. Doe said, 'Yes, but-' Before he could complete the sentence, G.K. yelled obscenities at him.

### C.  Michigan State Campus Police Involvement in this Matter

180.    Although Roe claimed that she went to the Michigan State Campus Police the following day, (i.e. September 1, 2017,) to report the matter, Michigan State Campus Police only reported the matter to OIE on September 8, 2017. The timing of the September 8, 2017 documented report coincides with the harassment campaign by Roe's friends.

181.    Roe's allegations that the Michigan State Campus Police secured the underwear and shorts she was wearing on the evening in question as well as retrieving the condoms used by Doe have never been independently verified.

182.    Michigan State Campus Police indicated to OIE that Roe chose not to have a police investigation.

183.     Despite Doe's repeated requests for a copy of the MSU Police Report concerning this incident, the report was never furnished to Doe.  On information and belief, the MSU Police Report concerning this incident was likewise never furnished to OIE for purposes of their investigation into this matter.

### D.  The Flawed and Gender Biased Investigation

184.    On September 8, 2017, Michigan State Campus Police reported to OIE that Roe reported that Doe had sexually assaulted her on September 1, 2017 in Case Hall.   OIE commenced its investigation. Michigan State Campus Police did not provide OIE with any of the physical evidence (i.e. Jane Roe's underwear and shorts as well as the condoms used by John Doe) that Roe alleged that the Michigan State Campus Police had collected.

185.    Defendant Abdnour is a licensed Michigan attorney with a background in advocating for survivors of sexual assault.  On information and belief, Defendant Abdnour approached the investigation in a gender-biased manner, with a presumption of Doe's guilt.  She

built a case against Doe instead of conducting a thorough, impartial investigation, as required by the RVSM.

186.    To begin, Defendant Abdnour interviewed Roe on September 20, 2017, twelve days after learning of the report of alleged assault.  As detailed below, this delay prejudiced Doe, by allowing for the loss of surveillance footage from the Case Hall dormitory.  Such footage was crucial evidence of Doe's incapacitation and Roe's alleged incapacitation.

187.    On September 20, 2017, OIE sent a letter via email to Doe's Michigan State email address, indicating that "OIE is conducting an investigation into a matter in which you have been named as a Respondent" and issuing an interim "no contact" directive.

188.    On information and belief, an interim "no contact" directive was not also issued to Roe.

189.    As an interim measure, Doe was removed from Case Hall, but Roe was not.

190.    As indicated by the disparity in the interim measures taken against Roe and Doe, the RVSM Policy as a whole, and Section XIII (L)(7) ("Interim Measures") of the RVSM, in particular, is written in a gender-biased manner that favors the rights of those alleging sexual assault over the rights of respondents to those allegations.

191.    The September 20, 2017 letter was the only notice that OIE provided Doe with prior to his investigative interview.

192.    The September 20, 2017 correspondence from OIE provided Doe vague and inadequate notice of the charges and allegations being made against him.

193.    Despite receiving a report from Michigan State Campus Police on September 8, 2017, that Roe reported that Doe had sexually assaulted her on September 1, 2017 in Case Hall,

OIE's initial correspondence to Doe did not inform him of these allegations or of the specific violations of the RVSM Policy that they were investigating.

194.     Defendants' vague and inadequate notice of the charges and underlying allegations against him put him at a disadvantage in preparing for his meeting with the investigators.

195.     Pursuant to Defendants' RVSM, Doe's meeting constituted his only opportunity to be heard.  At no point was Doe offered a live hearing or even an opportunity for live cross-examination of Roe or her witnesses.

196.     Defendant Abdnour, on behalf of OIE, conducted Doe's investigative interview on September 21, 2017.   Doe's parents accompanied him to the interview as his support persons. Doe was advised of the allegations made against him for the first time at the interview.

197.     Defendant Abdnour conducted the interview in a hostile tone and dismissed claims that Doe made without further investigation.

198.      Doe informed and identified for Defendant Abdnour the retaliatory actions he suffered at the hands of Jane Roe and her friends.

199.     Defendant Abdnour was aware of the following retaliatory behavior against Doe: 1) about a week after the incident, while Doe was away for the weekend, Roe's friends came running down the hall in an aggressive manner with the intention of fighting Doe, banged on the door to Doe's suite, and told Doe's roommate, Witness J.W. that Doe had "disrespected Roe;" Roe's friends also called him a few slurs; 2) someone had written obscenities on Doe's name tag on his dorm room door in the days following the alleged assault; and 3) at his interview, Doe detailed the manner in which G.K. had confronted him in the cafeteria on September 17, 2017.

200.    Without any objective, unbiased investigation, Defendant Abdnour dismissed Doe's claims of retaliation outright.

201.    Defendant Abdnour's bias is exemplified by her failure to interview any witnesses who observed G.K.'s September 17, 2017 profanity laced tirade against Doe in the public cafeteria.

202.    Defendant Abdnour likewise failed to indicate whether the actions that Doe complained of could be violations of other rules and regulations promulgated by Michigan State and failed to provide Doe with "next steps" should he wish to further pursue his allegations of retaliation.

203.    Despite the University's obligation to conduct an impartial investigation (RVSM Policy XIII.M.1), Defendant Abdnour made no timely independent attempt to seek out surveillance footage from the night in question. Such footage would have showed the parties entering Case Hall just minutes before their sexual encounter.

204.    In a case where OIE is required to investigate whether Doe and Roe were each independently incapacitated, OIE made no effort to secure this vital surveillance footage demonstrates gender bias against Doe.

205.    Indeed, at his interview, Doe, himself, requested that Defendant Abdnour, retrieve the surveillance footage.

206.    Although Defendants hold Defendant Abdnour to be a "senior investigator" it was not until September 29, 2017, a full three (3) weeks after OIE was notified of the incident and a full four (4) weeks since Michigan State's Campus Police were allegedly advised of the incident, that Doe had to follow up with Defendant Abdnour regarding collection of this important evidence.

207.     Defendant Abdnour, a "senior investigator", first unsuccessfully attempted to get the footage from the Michigan State Campus Police, then was directed to get the footage from Michigan State's Resident Education and Housing Services ("REHS").  By October 11, 2017, when Abdnour heard from REHS, she was told that the camera footage "did not go back that far."

208.     Defendant Abdnour's failure to make a timely, diligent attempt to locate the surveillance footage caused exculpatory evidence to be lost.

209.     Defendant Abdnour did not conduct an impartial and thorough investigation when she failed to independently request and assess social media content for Doe, Roe, and all witnesses.  Defendant Abdnour in fact only reviewed "publicly available information of both parties" twitter accounts only after requested to do so by Doe.

210.     Defendant Abdnour interviewed Roe and Doe.   Defendant Abdnour also interviewed the following witnesses on behalf of Roe: 1) E.M.; 2) L.M.; 3) K.W.; 4) N.O.; 5) G.K.; 6) R.M; and 7) J.C.  Defendant Abdnour also interviewed the following witness on behalf of Doe: 1) J.W.  Witness M.M., also interviewed, was suggested by both Roe and Doe.

211.     None of the witnesses were eyewitnesses to the alleged assault. Therefore, the investigation turned into a credibility contest between Roe and Doe.

212.     Defendant Abdnour's findings demonstrate that Doe lost the credibility contest due to gender bias on the part of Defendant Abdnour and the intense pressure at Michigan State to find males accused of sexual assault responsible.

213.     Defendant Abdnour failed to investigate numerous inconsistences in Roe's narrative, including but not limited to the following:

36

a. Roe told Defendant Abdnour that she went to the MSU Police Department the following day, i.e. September 1, 2017 to report the incident, but MSU reported the report of the alleged assault on September 8, 2017;

b. Roe told Defendant Abdnour that she went to Sparrow Medical Center to complete a SAFE examination on September 1, 2017. Roe stated that the wait time was too long and she had to "go up north with her family." She therefore left before completing the exam. However, witness G.K. stated that Roe did not complete the exam because she had to leave to attend a concert.

c. Witness K.W. states that Claimant said "she woke up in the morning with [the Respondent [Doe] in her bed and clothes all over the floor." Witness M.M. however stated that around 3:00 a.m., she opened the door to the room she shared with Roe, gave Doe and Roe time to dress, then had a conversation with Doe and Roe.

214. Defendant Abdnour likewise did not appropriately consider inconsistencies in Roe's narrative in evaluating Roe's credibility.

215. On information and belief, OIE did not schedule any follow up interviews with Roe to further discuss discrepancies in her narrative.

216. Indeed, throughout the investigation OIE did not provide Doe with any information regarding the status of the investigation vis-à-vis Roe. For example, no information was provided as to whether a follow up interview was scheduled with Roe or as to whether Roe filed an appeal.

217. Defendant Abdnour failed to adequately investigate whether Roe or her witnesses had a motive to lie. Such motives included:

a. According to Roe and witness N.O., Roe was a virgin who was waiting until marriage to have sexual intercourse. Defendant Abdnour should have investigated whether Roe was pursuing this investigation because she regretted her sexual encounter with Doe.

b. Defendant Abdnour did not appropriately consider whether Roe and her witnesses were motivated by revenge or a desire to "right a wrong" against Doe. On information and belief, Defendant Abdnour did not question Roe's witnesses about this motive despite knowing of the retaliatory behavior Doe had experienced. In Roe's interview, she told Abdnour that after the alleged incident, she saw Doe walking with another girl, and got "really pissed off about it."

218. The investigation also failed to thoroughly perform credibility analyses of Roe's witnesses. For example, Witness K.W. was allegedly involved with police on the night in question due to illegal drugs. Yet, the summary of K.W.'s interview contains no further information on this allegation and no analysis on how this might impact K.W.'s credibility. Likewise, Witness L.M. misstated the contents of her text messages with Doe; these misstatements can be independently verified by a review of the text messages between the parties.

219. Failing to conduct this credibility analysis, demonstrates Defendants bias against males in accepting the female complainant and her witnesses word in making a finding that Roe was incapacitated on the night in question.

220.    Despite the University's Policy that investigations should be completed within 60 calendar days (*see* RVSM XIII.M.5), Doe's final investigative report was not issued until four months after the incident, on January 3, 2018.

221.    Defendant Abdnour drafted the investigative report in a gender biased manner, including but *not* limited to:

    a.    Abdnour intentionally deleted significant exculpatory information provided by Doe in his response to the draft investigative report, including but not limited to a detailed description of the conversation between Doe and Roe on the way back to the dormitory shortly before the alleged assault. The deleted information directly contradicted a finding that Roe was "incapacitated;"

    b.    Abdnour drafted the report in a way that suggested Doe's guilt.  She included in the summary of N.O.'s witness interview that N.O. was on edge after the alleged assault when she was around Doe and had "pepper spray in her lap" during a game of cards. However, Defendant Abdnour failed to document that N.O.'s pepper spray is always attached to N.O.'s keychain.

**E.  Erroneous Finding of Responsibility**

222.    Based on the gender biased investigation she conducted, Defendant Abdnour erroneously concluded by a preponderance of the evidence that Doe sexually assaulted Roe.

223.    She specifically concluded that Roe "was incapacitated; and that a reasonable person in the Respondent's [Doe's] position should have known Claimant [Roe] was incapacitated and therefore unable to consent..."

224.    In rendering her decision, Defendant Abdnour failed to give appropriate weight to the follow indicators of Roe's capacity for consent on the night in question:

a.  Roe's request that respondent stand watch to keep her safe at the paint party;

b.  Roe grabbing of and provocative dirty dancing with Doe at the paint party;

c.  Roe's voluntary "gagging" of herself at various points in the night to expel alcohol from her system (self-induced vomiting) and her remarks to Doe that she was feeling better;

d.   Roe's 1.5 mile walk home with Doe, where she walked independently and had an intellectual and personal discussion with Doe;

e.  Roe's invitation to Doe to come to her dorm room

f.  Roe initiated kissing of Doe at the party, during the walk, and in her dorm room

g.  Roe's use of her keys to open her dorm room door

h.  Roe's independent undressing while in her dorm room and independent dressing before her conversation with M.M.

i.  Roe's request that Doe be quiet because she did not want to wake anyone else in the dorm up

j.  Roe's request that Doe get a condom before they advanced their sexual encounter;

k.  Roe's climb into the top bunkbed while Doe was retrieving condoms;

l.  Roe's climb down from the top bunkbed after being intimate with Doe;

m. Witness M.M.'s recollection that "Roe did not look drunk to her, Roe's eyes weren't bloodshot nor was Roe unable to focus and if Roe did not tell M.M. that she [Roe] was drunk, M.M. would not have known that. Notably, Witness M.M. saw them just minutes after the alleged sexual assault.

225.   Defendant Abdnour also speculated and exaggerated the amount of alcohol that Roe consumed.

   a.   Abdnour quantified the ounces consumed by Roe but such quantification was mere speculation.

   b.   Abdnour ignored Claimant's statement to her that she'probably' had three drinks" prior to leaving the dorm to go to the paint party.

   c.   Abdnour ignored Claimant's statement as reflected in the SAFE examination report that she only consumed "a few drinks."

   d.   Abdnour's investigative report falsely claims that Doe observed Roe unable to "form complete sentences."   To the contrary, Defendant Abdnour intentionally excluded exculpatory evidence of the intellectual and personal topics that Roe and Doe discussed on the walk back to Case Hall, shortly before the alleged assault.

**F.  Michigan State's Selective Enforcement of the RVSM**

226.   As described above, Defendant Abdnour failed to investigate Doe's claims of retaliation against him.   The retaliation alleged by Doe was prohibited by the RVSM and Michigan State had a duty to investigate.

227.   Additionally, Defendant Abdnour ignored the following evidence of Doe's incapacitation: 1) nausea; 2) vomiting; 3) clumsiness; 4) confusion.

228.   Defendant Abdnour in demonstrating her gender bias against males in selective enforcement of Defendants' policy and procedures, failed to investigate whether Roe had committed a sexual assault against Doe, in that Doe lacked the capacity to give consent.

### G. John Doe's Sanction

229.    John Doe was erroneously dismissed from Michigan State.

230.    Not only was the finding of sexual assault erroneous, but the sanction was overly punitive and not commensurate with OIE's (incorrect) findings.

231.    The RVSM requires that the RVSM/ADP Panel apply specific factors in determining the appropriate sanction against a respondent, including but not limited to:

  a.    The nature and severity of the misconduct.

  b.    The need to stop the misconduct and prevent its recurrence.

  c.    The need to remedy and address the impact or effects of the conduct on the claimant or other members of the campus community.

  d.    The respondent's prior record of misconduct

  e.    The level of ongoing threat to the safety and security of the claimant or campus community.

  f.    Aggravating or mitigating factors, including those articulated by the parties.

  g.    When applicable, the impact of separation on both parties.

232.    On January 13, 2018, Doe submitted a detailed Sanction Mitigation Statement to the RVSM/ ADP Panel, c/o judaffrs@vps.msu.edu, where he argued that the application factors listed in the RVSM Policy warranted a lenient sanction.

233.    In issuing their decision, the Panel merely listed the RVSM factors, and stated that it had considered them, but provided no application, no analysis, and no specificity.

234.    The Panel then made a finding that exaggerated the events that occurred on September 1, 2017 to make the "facts" fit the sanction of dismissal.

235.    The Sanction Panel violated the RVSM when it did not apply but merely listed the seven factors contained in Appendix K.

236.    Likewise, the Panel neither considered nor acknowledged that none of the aggravating factors were present in this matter. Aggravating factors include:

      a.  Multiple perpetrators;

      b.  Multiple victims;

      c.  Whether the responding party is in a position of power or influence;

      d.  Use of force;

      e.  Display of a weapon;

      f.  Use of drugs or alcohol to incapacitate or coerce consent;

      g.  Whether the alleged victim is under the age of eighteen

237.    Additionally, since Defendant Abdnour failed to include exculpatory information from Doe's response to the draft investigative report in her final report, the RVSMP / ADP Panel did not appropriately consider evidence such as the intellectual and personal conversation that Roe and Doe enjoyed on the walk back to the dorm shortly before the alleged assault.  Such evidence would support a lenient sanction because it indicates Roe's capacity to give consent.

**H.    John Doe's Appeal**

238.    On February 1, 2018, Doe timely filed an appeal with the Office of Vice President of Student Affairs and Activities, asserting that the findings of OIE were procedurally defective and arbitrary and capricious.

239.    Among other things, Doe alleged in his appeal, that OIE failed to conduct a "fair, unbiased and impartial investigation" in compliance with the RVSM Policy.

240.    Doe alleged that Defendant Abdnour demonstrated investigator bias by *inter alia* 1) intentionally failing to include significant exculpatory information from Doe's comments to the draft investigative report in the final report, such as the intellectual and personal  topics that Doe and Roe discussed on the walk back to Case Hall shortly before the alleged assault took place; 2) failing to give appropriate weight to indicia of Roe's capacity to give consent such as Roe's request in her dorm room that Doe be quiet because she did not want to wake anyone else up; and 3) intentionally speculating and exaggerating the amount of alcohol that Roe drank.

241.    Doe also appealed his sanction as being inappropriate and not commensurate with OIE's findings.

242.    Doe argued, *inter alia*, that the sanction imposed was based upon a fundamentally flawed and gender-biased investigative report.   For example, because Defendant Abdnour intentionally excluded exculpatory information that negated a finding of Roe's incapacity in the final investigative report, the Sanction Panel was denied the opportunity to consider such information.   Indeed, the Sanction Panel was, on information and belief, unaware of the intellectual and personal topics that Roe and Doe discussed on the walk back to Case Hall, shortly before the alleged assault occurred.

243.    The appeal further argued that the sanction of dismissal of Doe, a student with no prior disciplinary infractions, for a single, non-violent, non-coercive, progressive intimate encounter between two intoxicated young adults was clearly inappropriate and not commensurate with the seriousness of the event.

244.    On February 26, 2018, Doe's appeal was erroneously denied by Defendant Maybank.

I.      **Harm Suffered by John Doe**

245.    Doe has suffered immense emotional, reputational, financial, educational and professional harm stemming from Defendants' gender-biased, erroneous, selective finding of responsibility.

246.    On September 20, 2017, Michigan State issued an interim no contact directive against Doe.

247.    Due to the interim no contact directive, Doe felt extremely anxious about the possibility of running into Roe.

248.    Doe also felt anxious due to the retaliation that he had experienced from Roe's friends, which the University failed to investigate.

249.    As a result, he was afraid to go to the cafeteria during more traditional hours of the day and sometimes missed meals as a result.  On weekends, the only dining hall available was the one in Case Hall, where Roe resided, along with many of her friends.  Doe therefore had to order in food and eat alone in his room, or miss meals.

250.    To avoid running into Roe and her friends (the witnesses against him), Doe would use back staircases.

251.    The foregoing negatively impacted his mental well-being.

252.    On September 21, 2017, as an interim measure by Michigan State, Doe was inappropriately removed from Case Hall, the dorm he called home. He was lonely and isolated from his friends.

253.    Because Doe was moved into "single" versus housing with a roommate, he had to pay a higher cost for housing during the pendency of the investigation.

254.     His dismissal has foreclosed the opportunity to graduate with his matriculated class, i.e. the class of 2020, and from Michigan State, his chosen University. These actions will result in economic harm.

255.     Doe has permanently been prevented from completing his undergraduate degree by 2020. The gap in his undergraduate career likewise has caused economic harm.

256.     Doe's ability to matriculate into another undergraduate institution has been harmed by a false conduct dismissal.

257.     He has been rejected from fifteen undergraduate institutions, after applying to seventeen institutions.

258.     Some of these institutions have specifically noted that the reason for his rejection was the conduct dismissal from Michigan State.  One institution denied Doe acceptance and referred to his false conduct dismissal as a "severe criminal charge."  Another institution accepted Doe, but rescinded Doe's acceptance following a telephone call with Defendant Shafer regarding the disciplinary proceedings against Doe.

259.     Doe's dismissal severely limits his ability to enter law school and to pass the character and fitness examination to become a member of the bar.

260.     Doe's dismissal has severely limited his ability to pursue a career in the government, let alone in national security.

261.     His future earning potential is therefore irreparably harmed.

262.     Doe has sought spiritual counseling as a direct result of the Defendants' conduct in finding him responsible of sexually assaulting Jane Roe.

### J.      Climate at Michigan State Concerning Mishandling of Sexual Assault

263.    Going back to at least 2014, Michigan State had come under pressure from the federal government for mishandling of sexual assault cases.

264.    In 2014, the Department of Education identified Michigan State in a list of 55 institutions facing investigation for possible violations of federal law for mishandling sexual violence and sexual harassment complaints.  https://www.ed.gov/news/press-releases/us-department-education-releases-list-higher-education-institutions-open-title-ix-sexual-violence-investigations (last accessed on September 26, 2018).

265.    Subsequently, Michigan State received bad publicity over its handling of sexual assault cases.  For example, on September 1, 2015, the Detroit Free Press published an article concerning the University's mishandling of sexual assault cases, "Feds: MSU Mishandled Sexual Assault Cases."   https://www.freep.com/story/news/local/michigan/2015/09/01/feds-msu-mishandled-sexual-assault-reports/71525852/ (last accessed on September 26, 2018).

266.    That article not only publicized the University's settlement with OCR to remedy improper procedures and policies for the handling of sexual assault cases but highlighted the University's efforts to remedy the situation.  The article noted that then President Lou Anna Simon had "been working for several years to improve how they handle sexual assault on campus." *Id.* at 1.

267.    The already-heated campus climate concerning sexual assault reached its boiling point in 2017- 2018 academic year, when Doe was being investigated for sexual assault.

268.    As previously discussed, during the Winter and Spring of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on

February 22, 2018. https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).

269. Likewise, in the Winter of 2018, the University garnered a great deal of bad publicity concerning the sexual assaults committed by its former employee Dr. Larry Nassar. On January 25, 2018, the New York Times published an article entitled "With Larry Nassar Sentenced, the Focus is on what Michigan State Knew."

270. Upon information and belief, it was in part because of the pressure being exerted by OCR and because of the bad publicity surrounding the University, that the University sided with Roe over Doe in what amounted to a credibility contest.

271. Plainly, the University simply did not want another situation in which it could be perceived as ignoring the complaints of women on campus.

272. Upon information and belief, Defendant Michigan State has repeatedly conducted gender-biased investigations, conducted unfair procedures, and imposed disproportionate sanctions against male students accused of misconduct. https://www.nytimes.com/2018/01/25/us/larry-nassar-michigan-state-investigation.html (last accessed on October 6, 2018).

### COUNT I
#### (42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)
#### (Against the Individual Defendants)

273. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

274. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

275. In this case, Defendants are state actors subject to the Fourteenth Amendment.

276. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

277. A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

278. A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

279. Plaintiff's constitutionally protected property interest in his continued enrollment at Michigan State and his right to complete his undergraduate degree at Michigan State was violated by Defendants' actions.

280. Plaintiff had a constitutional right to be free from arbitrary suspension, dismissal, or restrictions on his ability to enter the Michigan State campus.

281. Plaintiff's constitutionally protected property interest in his right to continued enrollment at Michigan State also arises from the policies, courses of conduct, practices, and understandings established by Michigan State.

282. Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Michigan State and Plaintiff.

283. It is well established that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

49

284.    A person who has been admitted to a public University has a protected property interest in continuing his education at that University until he has completed his course of study. The state cannot deprive a person of this interest without due process.

285.    As a result, if Plaintiff as a Michigan State student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Michigan State used.

286.    Michigan State, as a land grant University established by the State of Michigan, and the individual Defendants, as agents of Michigan State, have a duty to provide Michigan State's students equal protection and due process of law by and through any and all policies and procedures set forth by Michigan State.

287.    Plaintiff obeyed all institutional rules when he was wrongly dismissed and thus barred from campus by Michigan State.

288.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in completing his undergraduate education at Michigan State at the time he was disciplined by Michigan State and in the future.

289.    Plaintiff was entitled to a meaningful opportunity to be heard and process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

290.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

291.    In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness in numerous respects, including, without limitation the following.

292.    Michigan State employs the so-called "single investigator model" for adjudicating sexual assault (and other Title IX) claims.

293.    Under the single-investigator model, as one federal district judge has described the process, a single individual "is given complete authority to decide whether the accused [is] 'responsible' for the alleged violations," acting "simultaneously [as] the investigator, the prosecutor, and the judge who determine[s] guilt."  *Doe v. Brandeis Univ*., 177 F. Supp. 3d 561, 579 (D. Mass. 2016).

294.    The single-investigator model contrasts with procedures at other colleges and universities where the accused is afforded a live hearing before a hearing panel, with an opportunity to confront the evidence against him and to cross-examine his accuser.

295.    The single-investigator model has been criticized by judges and commentators because: it is an inquisitorial, as opposed to adversarial, process; it offers no checks or balances against investigator bias, including unconscious racial or sexual bias; it allows a single individual to act as prosecutor, investigator, judge, and jury determining guilt; and, crucially, it allows the investigator to find the accused guilty without ever affording him a hearing where evidence can be confronted, witnesses questioned, and the accuser cross-examined.

296.    Recently, a District Court in this Circuit issued a preliminary injunction against the continued use of a single-investigator procedure in a sexual assault case at the University of Michigan, where a similar policy was in effect, stating that "this Policy deprives Plaintiff of a

live hearing and the opportunity to face his accuser. Because of the University's method of private questioning through the investigator, Plaintiff has no way of knowing which questions are actually being asked of Claimant or her response to those questions. Without a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant." *Doe v. Univ. of Mich.*, 2018 U.S. Dist. Lexis 112438 (E.D. Mich. July 6, 2018).

297.    Following Michigan State's single-investigator procedure, Defendants subjected Plaintiff to an inquisitorial, rather than adversarial, adjudicatory process, in which Defendant Abdnour served simultaneously as prosecutor, investigator, judge and jury adjudicating guilt, with no checks or balances on sexual bias.

298.    Following the University's single-investigator procedure, Defendants denied Plaintiff any opportunity for a live hearing.

299.    Following the University's single-investigator procedure, Defendants denied Plaintiff any opportunity to confront evidence, to face his accuser, to cross-examine his accuser, and to confront any other witnesses.

300.    Over ten years ago, the Sixth Circuit explicitly stated that in University disciplinary proceedings, in cases involving a "*choice between believing an accuser and an accused*," "*cross-examination* is not only beneficial*, but essential to due process*." *Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 641 (6th Cir. 2005) (emphasis added).

301.    On September 7, 2018, in *Doe v. Baum*, this Circuit explicitly reaffirmed the holding in *Flaim*.   *Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *1 (6th Cir. Sept. 7, 2018) ("Today, we reiterate that holding once again: if a public University has to choose between competing narratives to resolve a case, the University must give the accused student or his agent

an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder.")

302.   Since there were no eyewitnesses and no conclusive documentary or physical evidence, Roe's allegations against Plaintiff came down entirely to a credibility assessment – a "choice between believing an accuser and an accused."

303.   Accordingly, by declaring Plaintiff guilty of sexual assault without ever affording him any opportunity to cross-examine Roe or adverse witnesses, Defendants violated Plaintiff's clearly established constitutional rights.

304.   Moreover, Michigan State improperly employs a disciplinary process that fails to utilize mechanisms designed to ensure the parties involved receive fair and appropriate due process:

     a.   There is no sworn testimony;

     b.   There is no cross-examination; and

     c.   There is no proper hearing in which testimony was taken.

305.   Defendants' conduct in failing to give Plaintiff notice of the allegations against him stemmed from a presumption that Roe's accusations were true simply because she was the female complainant.

306.   The process afforded by Michigan State results in Defendants having  unfettered discretion to engage in discriminatory decision-making in favor of a female first year student at the expense of a male sophomore student.

307.   Michigan State's procedures were defective and violated due process because they do not allow for the taking of testimony and cross-examination of witnesses.

308.   Defendants were pressured by the Obama Administration's DOE into following the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter regardless of what otherwise would be proper due process considerations.

309.   Michigan State was the subject of two OCR investigations that were resolved in 2015.   The OCR concluded that Michigan State failed to investigate two sexual assault complaints in a timely manner and that policy deficiencies may have contributed to a hostile environment for some students and employees in the past.

310.   During the Winter of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.   The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018. https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).  Those investigations are still pending.

311.   Lhamon, as quoted above, made numerous public statements about the obligation of colleges and universities to conform to the Dear Colleague Letter or face the cut-off of federal funding.  The DOE and OCR have accordingly treated the Dear Colleague Letter as binding on regulated parties for all practical purposes.

312.   The Dear Colleague Letter has in fact resulted in significant action and legal consequences.   At the July 2014 Dartmouth College conference, Ms. Lhamon stated: "Our release of the [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the [Dear Colleague Letter]."

313.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to: (i) his right to a fair adjudication,

54

free of bias; (ii) his right to be innocent until shown to be responsible; (iii) his right to be heard by an impartial factfinder; (iv) to question his accuser, challenge the credibility of other adverse witnesses; and (iv) his right to present evidence and witnesses in support of his defense.  These rights are well established by Sixth Circuit precedent.

314.   In attempting to demonstrate their compliance with the Dear Colleague Letter, the Defendants subjected Plaintiff to an insufficient process when they failed to provide Plaintiff with a fair and reasonable opportunity to defend himself; and arrived at a predetermined, arbitrary, and unwarranted decision tainted by gender bias.

315.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

316.   Defendants, as well as other agents, representatives, and employees of Michigan State, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

317.   Defendants all agreed to, approved, and ratified this unconstitutional conduct as described above.

318.   As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation, loss of employment and educational opportunities, and other economic and non-economic damages.

319.   In particular, the discipline imposed by Michigan State has permanently damaged Plaintiff's career prospects in his chosen profession, denied him the benefits of education at his chosen school and damaged Plaintiff's reputation.

320.    Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

321.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress; loss of educational and career opportunities; economic injuries; and other direct and consequential damages.  Plaintiff's interests in the results of the disciplinary process are significant.

322.    Defendants' conduct as described herein was malicious, reckless, and/or callously indifferent to Plaintiff's rights such that Plaintiff is entitled to an award of punitive damages.

323.    As a result of the foregoing, Plaintiff's damages are an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction  enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, and requiring Michigan State to destroy all disciplinary records concerning Plaintiff.

### COUNT II
### (Violation of Title IX of the Education Amendments of 1972)
### (Against Michigan State)

324.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

325.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

> subjected to discrimination under any education program or
> activity receiving Federal financial assistance.

326.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

327.    According to Michigan State's 2017- 2018 Budget, it received over $18 million in federal funds.

328.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of University discipline where gender is a motivating factor in the decision to discipline.  In either case, the statute is enforceable through an implied private right of action.

329.    The Obama Administration's promulgated regulations under Title IX require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student … complaints alleging any action which would be prohibited by" Title IX or regulations thereunder.  Such prohibited actions include all forms of sexual misconduct.  34 C.F.R. § 106.8(b).

330.    Even the Obama Administration ostensibly recognized that the procedures adopted by a school such as Michigan State covered by Title IX must accord due process to both parties involved.

331.    Moreover, there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

332.    The Sixth Circuit has expressly recognized several different "theories of liability that a student who is 'attacking a University disciplinary proceeding on grounds of gender bias' can potentially assert under Title IX." *Doe v. Miami Univ.,* 882 F.3d 579, 589 (6ᵗʰ Cir. 2018) (citation omitted).

333.    Three of these recognized theories of liability are "(1) 'erroneous outcome,' (2) 'selective enforcement,' [and] (3) 'deliberate indifference.'" *Id.*

334.    To plead an erroneous-outcome claim under Title IX, a Plaintiff found guilty of sexual assault by a University must allege: "(1) 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) a 'particularized . . . causal connection between the flawed outcome and gender bias.'" *Id.* at 592 (citations omitted).

335.    Here, Defendants' finding that Plaintiff was guilty of sexual assault, based on a finding that Roe was incapacitated and unable to give consent was utterly erroneous.  Facts casting much more than "articulable doubt" on its accuracy have been recounted in detail above, but such facts include, without limitation:

   a.   The fact that there were no eyewitnesses to the alleged sexual assault.  The outcome of the investigation therefore depended on the outcome of a credibility contest between Roe and Doe.

   b.   The fact that there was no live hearing and no cross-examination of the accuser, which alone, as the United States District Court for the Eastern District of Michigan recently stated, creates a "significant" risk of an "erroneous" outcome. *Doe v. Univ. of Mich.,* 2018 U.S. Dist. Lexis 112438 (E.D. Mich. July 6, 2018) ("Without a live proceeding, the risk of an erroneous deprivation of Plaintiff's interest in his reputation, education, and employment is significant.").

   c.   The fact that Roe had significant inconsistencies within the narrative of the alleged assault that she recounted to investigators.

   d.   The fact that the investigator failed to include significant portions of Doe's feedback to the draft investigative report in the final investigative report. The portions omitted contained exculpatory evidence.

e.  The fact that the investigator speculated and exaggerated the amount of alcohol consumed by Roe while minimizing Roe's own statements that she only consumed "a few" or "'probably' three drinks".

f.  The investigator failed to give appropriate weight to the following specific facts that demonstrate Roe had adequate capacity to give consent:

i.  Roe's request that respondent stand watch to keep her safe at the paint party;

ii.  Roe grabbing of and provocative dirty dancing with Doe at the paint party;

iii.  Roe's voluntary "gagging" of herself at various points in the night to expel alcohol from her system (self-induced vomiting) and her remarks to Doe that she was feeling better;

iv.  Roe's 1.5 mile walk home with Doe, where she walked independently and had an intellectual and personal discussion with Doe;

v.  Roe's invitation to Doe to come to her dorm room;

vi.  Roe initiated kissing of Doe at the party, during the walk, and in her dorm room

vii.  Roe's use of her keys to open her dorm room door

viii.  Roe's independent undressing while in her dorm room and independent dressing before her conversation with M.M.

ix.  Roe's request that Doe be quiet because she did not want to wake anyone else in the dorm up

x.  Roe's request that Doe get a condom before they advanced their sexual encounter;

xi.  Roe's climb into the top bunkbed while Doe was retrieving condoms;

xii.  Roe's climb down from the top bunkbed after being intimate with Doe;

Witness M.M.'s statement that Roe did not look drunk to her, Roe's eyes weren't bloodshot nor was Roe unable to focus and if Roe did not tell M.M. that she [Roe] was drunk, M.M. would not have known that.

336.   There was a particularized causal connection between the clearly erroneous outcome in this case and **gender** bias.  Facts sufficient to plead the existence of this bias and its connection to the clearly erroneous outcome have already been alleged above in detail and include, without limitation, the following.

   a.  The investigator's credibility determination—which her finding entirely depended on—was based wholly on gender bias.  The investigators chose simply to credit Roe's story and reject Plaintiff's statements even though there was no evidentiary basis for doing so.

   b.  The investigators' further demonstrated gender bias in the disparate and unlawful weight they gave to Roe's witnesses on the one hand as opposed to witnesses corroborating Plaintiff's statements on the other.

   c.  The investigator failed to adequately investigate discrepancies in Roe's narrative.  Such discrepancies include but are not limited to a discrepancy concerning the date she reported the alleged assault to the Michigan State Campus Police and a discrepancy concerning the reason she failed to initially complete a SAFE examination on September 1, 2017.

   d.  The investigator failed to appropriately assess whether Roe or her witnesses had other motives for pursuing a Title IX investigation.  Such motives include a desire for revenge on the part of Roe's witnesses, who believed that their friend had been wronged.  On Roe's part, a motive that the investigator failed to investigate is whether Roe was pursuing the investigation to seek revenge against Doe or out of regret for her sexual encounter with Doe.

   e.  The investigator failed to independently seek out surveillance footage of Doe and Roe entering the dormitory shortly before the assault.  The investigators delay led to the surveillance footage no longer being available for review.

   f.  The investigators likewise failed to conduct thorough independent credibility analyses of Roe's witnesses.

   g.  The investigators omitted significant portions of Doe's feedback to the draft investigative report in the final investigative report. The portions omitted contained exculpatory evidence.

   h.  The fact that the investigator speculated and exaggerated the amount of alcohol consumed by Roe while minimizing Roe's own statements that she only consumed "a few" or "'probably' three drinks".

    i.   The investigator failed to give appropriate weight to the following specific facts that demonstrate Roe had adequate capacity to give consent:

       i.   Roe's request that respondent stand watch to keep her safe at the paint party;

      ii.   Roe grabbing of and provocative dirty dancing with Doe at the paint party;

     iii.   Roe's voluntary "gagging" of herself at various points in the night to expel alcohol from her system (self-induced vomiting) and her remarks to Doe that she was feeling better;

     iv.   Roe's 1.5 mile walk home with Doe, where she walked independently and had an intellectual and personal discussion with Doe;

      v.   Roe's invitation to Doe to come to her dorm room

     vi.   Roe initiated kissing of Doe at the party, during the walk, and in her dorm room

    vii.   Roe's use of her keys to open her dorm room door

   viii.   Roe's independent undressing while in her dorm room and independent dressing before her conversation with M.M.

     ix.   Roe's request that Doe be quiet because she did not want to wake anyone else in the dorm up

      x.   Roe's request that Doe get a condom before they advanced their sexual encounter;

     xi.   Roe's climb into the top bunkbed while Doe was retrieving condoms;

    xii.   Roe's climb down from the top bunkbed after being intimate with Doe;

   xiii.   Witness M.M.'s recollection that Roe did not look drunk to her, Roe's eyes weren't bloodshot nor was Roe unable to focus and if Roe did not tell M.M. that she [Roe] was drunk, M.M. would not have known that.

337.   This disparate treatment of Roe and Doe in the investigation was a result of gender bias and a clear act of sex discrimination, leading directly to Michigan State's false conclusion that Plaintiff was guilty of sexual assault.

338.    In addition, Defendants' erroneous outcome in Plaintiff's case was a direct result of a gender-biased campaign to credit female students' claims of sexual assault launched by Michigan State.

339.    As detailed above, around 2014 the University came under intense pressure from several different sources to vigorously prosecute female students' claims of sexual assault and to punish alleged male sexual assailants.

340.    On September 1, 2015, OCR issued a letter to Michigan State finding a "sexually hostile environment" at the University.  OCR threatened Michigan State with a cut-off of federal funding—a potential loss of millions of dollars—due to claims that the University had failed to vigorously prosecute, make findings against, and punish alleged male sexual assailants.

341.    Later that month, a report was published, attracting considerable media attention, alleging extraordinarily high levels of unredressed sexual assaults against female undergraduates at Michigan State.

342.    The already-heated campus climate concerning sexual assault reached its boiling point 2017-2018 academic year, when Doe was being investigated for a potential violation of MSU's Sexual Misconduct Policy.

343.    As previously discussed, during the Winter of 2018, there were two open OCR investigations against Michigan State University for Title IX sexual violence violations.  The first was commenced on July 28, 2017 and the second was commenced on February 22, 2018. https://projects.propublica.org/graphics/civil-rights-violations#840 (last accessed on September 24, 2018).

344.    Likewise, in the Winter of 2018, the University garnered a great deal of bad publicity concerning the sexual assaults committed by its former employee Dr. Larry Nassar.

345.    Determined to placate OCR, to avoid the potential loss of millions of dollars in federal funding, to restore its reputation, and to protect itself from future liability, Defendants in or shortly after September 2015 launched a campaign to—in its own words—go "above and beyond" even OCR's demands, and to "drive cultural change," prosecuting female students' sexual assault claims aggressively, proving its willingness to believe female students who claimed sexual assault,  making findings against, and punishing alleged assailants.

346.    Thus, when it found Plaintiff guilty of sexual assault, Defendant Michigan violated Title IX under the "erroneous outcome" theory of liability.  Plaintiff was wrongly found responsible and the finding of responsibility was motivated by gender bias.

347.    In the Sixth Circuit, to sufficiently plead a Title IX violation under the "deliberate indifference" and "selective enforcement" theories of liability, a male student found guilty of sexual assault by a University may allege that responsible University officials had knowledge that the male student had a claim that he in fact was sexually assaulted by the female complainant, but that such officials only investigated or prosecuted her claim against him, while not prosecuting or investigating his claim against her. *Doe v. Miami Univ.,* 882 F.3d 579, 591 (6th Cir. 2018) (deliberate indifference); *but see Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *9 (6th Cir. Sept. 7, 2018) (to plead a Title IX deliberate-indifference claim, the misconduct alleged must be sexual harassment, not just a biased disciplinary process); *Gischel v. Univ. of Cincinnati,* No. 1:17-cv-475 (S.D. Ohio, July 6, 2018) (selective enforcement).  It is not necessary, in such cases, that the male student file a formal charge.  *Id.*

348.    Michigan State violated Title IX through deliberate indifference to gender bias and through gender-biased selective enforcement in Plaintiff's case:

a. Defendant Abdnour failed to appropriately investigate Doe's claim that he had been retaliated against by Roe's friends. Doe claimed, *inter alia*, that G.K. had confronted him in the cafeteria and had cursed at him.

b. Defendant Abdnour ignored the following evidence of Doe's incapacitation: 1) nausea; 2) vomiting; 3) clumsiness; 4) confusion.

c. Defendant Abdnour failed to investigate whether Roe had committed a sexual assault against Doe, in that Doe lacked the capacity to give consent, as delineated in the RVSM.

d. The University sanction of dismissal was unduly punitive.  The RVSMP /ADP Panel merely listed the factors to be considered in determining a sanction but failed to provide any meaningful application and analysis of the factors to Doe's matter. In the face of two pending OCR investigations in the Winter of 2018, and in the midst of the bad publicity surrounding Larry Nassar, a former Michigan State employee who sexually assaulted numerous women, the University sought to issue a harsh sanction to prove it was tough on offenders.

*See Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) (selective enforcement claim asserts "that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender.")

349.    Accordingly, Michigan State violated Title IX through deliberate indifference to gender bias and through gender-biased selective enforcement in Plaintiff's case.

350.     As a result of the foregoing, Plaintiff is entitled to a judgment against Michigan State awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the University for future studies.

## COUNT III
## Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution)
## (Against all Defendants)

351.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

352.     The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

353.      The allegations of gender discrimination made in Count II above and elsewhere in this Complaint further demonstrate that Defendants violated Plaintiff's clearly established right not to be discriminated against on the basis of sex, in violation of the Fourteenth Amendment and, therefore, 42 U.S.C. § 1983.

354.     As a result of the foregoing, Plaintiff is entitled to a judgment against Michigan State awarding Plaintiff an injunction against further violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, including Plaintiff's, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual defendants in their personal capacities, damages, including punitive damages, in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
### (State Law Estoppel and Reliance)
### (Against Michigan State)

355.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

356.     Michigan State's various policies constitute representations and promises that Michigan State should have reasonably expected to induce action or forbearance by Plaintiff.

357.     Michigan State expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that it would not tolerate, and Plaintiff would not suffer harassment by fellow students; and it would not deny Plaintiff his procedural rights should he be accused of a violation of Michigan State's Policies.

358.     Plaintiff relied to his detriment on these express and implied promises and representations made by Michigan State.

66

359. Based on the foregoing, Michigan State is liable to Plaintiff based on estoppel.

360. Plaintiff is entitled to recover damages for Michigan State's breach of the express and/or implied contractual obligations described above.  As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and other career opportunities, economic injuries and other direct and consequential damages.

**COUNT V**
**Violation of Plaintiff's Due Process Rights Article 1, § 17 of Michigan's Constitution - Fair and Just Treatment in the Course of Legislative and Executive Investigations and Hearings (Against All Defendants)**

361. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

362. Plaintiff has the right under the Michigan Constitution, among others, to fair and just treatment in the course of an investigation and/or hearing.

363. Defendants, by virtue of custom and policy and under color of law, have violated Plaintiff's rights conferred by the Michigan Constitution by, among other things –

    a. denying him fair and just treatment in the course of an investigation;

    b. Seeking to placate and eliminate Roe's complaint rather than conducting a fair and impartial investigation;

    c. Failing to conduct a hearing in which testimony was taken at any point in the process;

    d. Ignoring the inconsistencies in Roe's narrative in a manner designed to bolster the accounts of female accusers and rationalize their inconsistencies, to the detriment of the male accused;

e. Failing to provide Plaintiff the opportunity to be heard in front of a fair and impartial tribunal;

f. Failing to provide Plaintiff the opportunity to confront and cross-examine Roe and any adverse witnesses at a fair hearing;

g. Arbitrarily and capriciously dismissing Plaintiff from Michigan State.

364. The foregoing acts were intentional, unlawful, unprivileged, and without protection of any immunity.

365. As a direct and proximate cause of Defendants' actions in violation of Plaintiff's constitutional rights, Plaintiff suffered and continues to suffer tremendous damages, including, without limitation, emotional distress; loss of educational and other career opportunities; economic injuries and other direct and consequential damages.

366. Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

367. As a result of the foregoing, Plaintiff is entitled to a judgment awarding Plaintiff an injunction enjoining Michigan State from engaging in violations of the Michigan Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI
## Intentional Infliction of Emotional Distress
## (Against All Defendants)

368.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

369.     Defendants' conduct as more fully outlined above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses was intentional.

370.     Defendants' conduct as more fully outlined above including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was extreme, outrageous, and of such character as not to be tolerated by a civilized society, *i.e.,* where the accused is provided no meaningful opportunity to defend himself against false allegations.

371.     Defendants' conduct as more fully outlined above was for an ulterior motive or purpose, *i.e.,* in an effort to appease Roe, avoid further scrutiny from OCR concerning Michigan State's handling of sexual misconduct matters, and to avoid further bad publicity in the wake of the Larry Nassar scandal, a former Michigan State employee who committed numerous sexual assaults.

372.     Defendants' conduct resulted in severe and serious emotional distress.

373.     As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional and psychological distress, humiliation and embarrassment, sleeplessness and depression; and other damages that may arise during the course of discovery and the course of trial in this matter.

374.     Defendants' conduct as described herein was so egregious, malicious, and willful as to warrant an award of exemplary damages under Michigan law.

### COUNT VII
### Negligent Infliction of Emotional Distress
### (Against All Defendants)

375.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

376.     Defendants' conduct as more fully outlined above, including but not limited to failing to provide due process, and specifically failing to provide Plaintiff with a hearing or an opportunity to cross-examine his accuser and any adverse witnesses, was, at the very least, negligent.

377.     Defendants' negligence proximately caused the harm to Plaintiff's reputation and educational career.

378.     The Defendants' actions as more fully outlined above would naturally and probably result in emotional distress to Plaintiff.

379.     The Defendants' actions did, in fact, cause severe emotional distress to Plaintiff.

380.     The emotional distress suffered by Plaintiff physically manifested itself in symptoms including, but not limited to:  sleeplessness; depression; and such other injuries and physical manifestations as may appear during discovery in this matter.

### PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)     on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against the individual defendants  awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic

opportunities, and loss of future career prospects, punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and, against all Defendants, an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, and requiring Michigan State to destroy all disciplinary records concerning Plaintiff;

(ii)     on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Michigan State awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff; and reinstating Plaintiff to the University for future studies;

(iii)    on the third cause of action for violation of the Equal Protection Cause of the Fourteenth Amendment to the United States Constitution under 42 U.S.C. § 1983, a judgment against all Defendants awarding Plaintiff an injunction against violations of the United States Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and, against the individual Defendants, damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for state law breach estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)      on the fifth cause of action for violation of the Michigan Constitution, a judgment awarding Plaintiff an injunction against and to an injunction enjoining violations of the Michigan Constitution in the process of investigating and adjudicating sexual misconduct complaints, expunging Plaintiff's records, requiring Michigan State to destroy all disciplinary records concerning Plaintiff and reinstating Plaintiff to the University for future studies and damages in an amount to be

determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for Intentional Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and treatment of same, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, exemplary damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)    on the seventh cause of action for Negligent Infliction of Emotional Distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, and the cost for treatment of same;

(viii)   awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated: New York, New York
      December 26, 2018

    Respectfully Submitted,

    **NESENOFF & MILTENBERG, LLP**

    By: _/s/Andrew T. Miltenberg_
    Andrew T. Miltenberg, Esq.
    Stuart Bernstein, Esq.
    Tara J. Davis, Esq.
    Attorneys for Plaintiff
    363 Seventh Avenue, 5th Floor
    New York, New York 10001
    212-736-4500 (telephone)
    212-736-2260 (fax)
    amiltenberg@nmllplaw.com
    sbernstein@nmllplaw.com
    tdavis@nmllplaw.com

**SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC**
Matthew G. Borgula (P57330)
Donald A. Davis (P24049)
15 Ionia Ave SW #520
Grand Rapids, MI 49503
616-458-5500 (telephone)
matt@sbbllaw.com
dondavis@sbbllaw.com

*Attorneys for Plaintiff John Doe*